## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **DIAMOND TRANSPORTATION** )<br>**SERVICES, INC.,** )<br>**7307 Highland Street** )<br>**Suite C, Springfield, VA 22150,** )<br> )<br> **Plaintiff,** )<br> )<br>**v.** )<br> )<br>**WASHINGTON METROPOLITAN** )<br>**AREA TRANSIT AUTHORITY,** )<br>**300 Seventh Street, SW** )<br>**Washington, DC 20024,** )<br> )<br>**Serve:** **Patricia Y. Lee, Esq.** )<br> **General Counsel's Office** )<br> **WMATA** )<br> **300 Seventh Street, SW** )<br> **Washington, DC 20024** )<br> )<br> **Defendant.** )<br>_____ ) | **JURY TRIAL DEMANDED**<br><br>**Case No. 1:26-cv-236** |

## VERIFIED COMPLAINT

DIAMOND TRANSPORTATION SERVICES, INC. ("Diamond" or "Plaintiff"), by and through its attorneys, brings this action against WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY ("WMATA" or "Defendant"): (1) Breach of Contract; (2) Breach of the Implied Covenant of Good Faith and Fair Dealing; and (3) Declaratory Judgment. Plaintiff states its claim for damages and declaratory and other relief and alleges as follows:

### I.    NATURE OF ACTION

1. This action involves WMATA Contract No. CACCS244151 (the "Contract"). This firm fixed-price Contract was awarded by WMATA to Diamond on June 21, 2024, to provide 100% of dedicated MetroAccess paratransit service delivery throughout WMATA's service geography. The

contract period of performance is for a five (5)-Year Base Period from July 1, 2024, through June 30, 2029, in the amount of $365,893,730.00, with five one-year options (exercisable at WMATA's discretion) that brings the total Contract value to $853,861,099.85. A copy of the Contract is appended hereto as **Exhibit 1**.

2.    The Contract provides that WMATA awarded Diamond an exclusive contract for 100% of all dedicated paratransit services (as measured in Revenue Service Hours ("RSHs")) throughout WMATA's service area during the base period.

3.    WMATA wrought a cardinal change and materially breached the Contract by, *inter alia*, diverting to another paratransit provider, Challenger Transportation, Inc. ("Challenger"), RSHs that were awarded solely and exclusively to Diamond. This diversion of RSHs is in violation of the plain terms of the Contract and Diamond's exclusive award of 100% of the RSHs for at least the five-year based period from July 1, 2024 - June 30, 2029.

4.    By diverting RSHs to Challenger and by introducing a competitor where none was to exist, WMATA has deprived Diamond of the core benefits of its exclusive award, economies of scale, and its fundamental economic expectations under the Contract.

5.    WMATA's sole-source appointment of Challenger as an alternative provider of dedicated paratransit services – and WMATA's unilateral redistribution of Diamond's allocated RSHs and dedicated service vehicles to Challenger – is in direct violation of both the Contract and WMATA's own procurement regulations.

6.    In addition, WMATA has directly and repeatedly interfered with Diamond's workforce in ways that are clearly designed to hinder Diamond's ability to perform and to deprive Diamond of the benefits of its bargain, which violates the implied covenant of good faith and fair dealing.

7.   WMATA's material breaches of the Contract and the implied covenant of good faith and fair dealing effect a constructive termination of the Contract for WMATA's convenience.  As set forth in more detail below, WMATA's material breaches of, and cardinal changes to, the Contract has nullified the essential bargain between the parties.   Consequently, Diamond's further performance is excused as a matter of fact and law.

8.   On November 26, 2025, Diamond submitted a Certified Claim in the amount of $7,281,945, which sum includes both Diamond's accrued, retrospective contract damages, and the properly reimbursable costs associated with the orderly wind-down of Diamond's operations pursuant to Section 27 of WMATA's Standard Terms and Conditions ("Termination for Convenience," incorporated by reference into the Contract).   WMATA's material breaches and repeated misconduct have triggered a constructive termination for convenience. As part of this Certified Claim, Diamond also included a distillation of the substantial damages that will continue to accrue and for which WMATA will be liable, based on the most recent extracontractual diversions of paratransit RSHs that WMATA issued on October 31, 2025.

9.   WMATA issued its Contracting Officer Final Decision ("COFD") on January 23, 2026, in which it denied Diamond's claims in their entirety.

10.  Pursuant to Section 29 of WMATA's Standard Terms and Conditions ("Disputes," incorporated by reference into the Contract), Diamond has exhausted its administrative remedies and this dispute is properly submitted to this Court for judicial resolution.

## II.    JURISDICTION AND VENUE

11.  This Court has subject matter jurisdiction pursuant to the WMATA Compact, D.C. Code § 9-1107.01(81). WMATA has further waived sovereign immunity and consented to suit in this

Court by incorporating Section 29(c) of WMATA's Standard Terms and Conditions into the Contract, which provides for judicial resolution of contract disputes in this judicial district.

12. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391 because WMATA is headquartered in the District of Columbia, the Contract was awarded and administered in the District of Columbia, and the acts and omissions giving rise to this action occurred in substantial part in the District of Columbia.

### III.    FACTUAL BACKGROUND

#### *The Contract*

13. On January 5, 2024, WMATA issued Solicitation ID #0000009715/Contract ID #CACCS244151, which sought proposals from vendors to provide dedicated paratransit access services within WMATA's geographic footprint in the greater Washington, DC metropolitan area.

14. At the time this RFP was issued, WMATA had several dedicated paratransit service vendors, including Challenger, Transdev, and Diamond (formerly known as National Express).

15. Dedicated paratransit service is mandated by the Americans with Disabilities Act ("ADA"), and requires that transit authorities like WMATA offer door-to-door or curb-to-curb rides for individuals with disabilities who cannot use regular public transportation, providing comparable service hours, days, and locations, but requiring pre-booking for shared rides in accessible vehicles like vans with lifts. "Dedicated" in this context means paratransit services using the fleet of accessible vehicles that are owned by WMATA, but that are operated and maintained by the contractor (e.g., Diamond).

16. For purposes of the solicitation and Contract, paratransit service geography was divided into two Zones (Zone 1 and Zone 2).[1] Under the terms of the Price Schedule Sheet in the solicitation, contractors were invited to provide fixed hourly rates for each year of service, and contractors had "the option to submit bids for Zone 1, submit bids for Zone 2, and/or bids for *100% of the service (both zones)*." (Emphasis added.)

17. The Contract was to be awarded on a firm fixed-price basis. For purposes of evaluating proposals, WMATA instructed bidders to use 591,480 RSHs/year for Zone 1 and 524,520 RSHs/year for Zone 2 in the tabular presentation of their bid proposals. WMATA's solicitation was clear that these "estimated hours are provided for evaluation purposes only and do not represent a firm commitment to purchase any amount of service." The RSH totals that WMATA used for purposes of evaluating solicited bids equal 1,116,000 RSHs/year between Zones 1 and 2, or an average of 93,000 RSHs/month. In reality, however, the actual volume of RSHs has been closer to 120,000-130,000 RSHs/month over the Contract period to date (July 1, 2024-present.)

18. The procurement was also designed so that WMATA could select a single awardee for Zone 1 and a separate, single awardee for Zone 2, or, WMATA could select a sole awardee responsible for providing 100% of the dedicated paratransit service in both zones. This is made abundantly clear throughout the solicitation (which ultimately became the Conformed Contract):

- "WMATA seeks to select one or two contractors to deliver MetroAccess paratransit service, as required by the Americans with Disabilities Act (ADA). . . . The Contractor will be responsible for providing service for trips originating from one of two zones. . . . Vendors can bid on Zone 1 or Zone 2. **Separately, Vendors can submit one bid for both zones.**" (Part 2 of 2 Technical Specifications, pg. 131 of Conformed Contract. Emphasis added.)

---

[1] The Solicitation defined Zone 1 as the area of Prince George's County north of MD-214 (excluding zip code 20743) and all of Montogomery County and Zone 2 as the area of Price George's County south of MD-214 (excluding zip code 20721) and all of Virginia. District of Columbia trips were allocated between two vendors if a Zone 1 awardee and a Zone 2 awardee were selected, or would be the responsibility of the sole awardee of 100% of the service volume.

- "This contract is awarded by zone. Only one vendor will be awarded per zone. The Operations Control Center (OCC) will only reassign trips to the zone vendor." (Solicitation 0000009715 Q&A #3)

- "Q: Do proposers need to submit separate bids if bidding on a particular zone as well as 100% of the contract? Or can proposers submit one technical proposal and separate the areas that are particular to one zone/full contract? A: A vendor can submit one bid, but separated by zones. **This approach will give the vendor an opportunity to be awarded 100% of the service _or_ one of the two zones.**" (Solicitation 0000009715 Q&A #32. Emphasis added.)

19.  In its February 15, 2024 proposal, Diamond bid fixed hourly rates for each year of the five-year base period for both Zones 1 and 2, which totaled $203,320,398 through the base period for Zone 1 and $177,442,140 for Zone 2, using WMATA's RSH estimate of 1.116 Million RSHs/year.  Diamond also bid fixed hourly rates for each year of the five-year option period for both Zones 1 and 2, which totaled $271,474,508 for Zone 1 and $236,772,584 for Zone 2 through the five option years.  Diamond also offered a lower, combined fixed hourly rate bids for 100% of the service in both Zones 1 and 2 at a 4% discount to its separate fixed price bids for Zone 1 and Zone 2 through both the five-year base period, and for each of the five option years. At 100% of all dedicated paratransit service, Diamond's lower, combined fixed rate bid totaled $365,893,730 over the five-year base period, and totaled $487,967,370 over the five option years, for a grand total of $853,861,099 for the full ten-year period (including five option years).

20.  On June 21, 2024, WMATA issued its Notice of Award to Diamond for 100% of all dedicated paratransit services in Zones 1 and 2. WMATA accepted Diamond's combined, lower bid for both zones and awarded the Contract in the amount of $365,893,730 over the five year base period and $853,861,099 over ten years (assuming WMATA exercises each of its five one-year options).  No other bidder (including Challenger) received an award because 100% of the dedicated paratransit service was awarded exclusively to Diamond.

21.  Diamond was able to offer this lower, combined bid precisely because of the economies of scale and stability that are present only if it is the exclusive operator.  Crucially, exclusivity ensures a stable labor market and workforce costs because drivers are not subject to competitive poaching by one or more other paratransit vendors. The largest costs that a paratransit contractor faces are the wage  and training costs of its drivers.  The introduction of one or more vendors who compete for these drivers increases wage costs and the costs to train newly hired, replacement drivers.

*WMATA's Superior Knowledge and Diamond's Reasonable Reliance*

22.  On information and belief, WMATA's Managing Director of Access Services, Christiaan Blake, publicly acknowledged that Challenger's existing paratransit contract expired on June 30, 2024, the day before the Contract's base period commenced on July 1, 2024.

23. WMATA possessed superior knowledge, not available to Diamond or other bidders, that it intended to continue using Challenger and to maintain a multi-vendor dedicated paratransit delivery structure notwithstanding the exclusive award to Diamond.

24. WMATA failed to disclose this superior knowledge during the solicitation and instead represented that a single vendor could be awarded 100% of dedicated paratransit service.

25. Diamond reasonably relied on WMATA's representations of exclusivity in submitting discounted pricing predicated on economies of scale, workforce stability, and the absence of competitive labor market distortions.

26. Had Diamond known that WMATA intended to continue using Challenger or other vendors, Diamond would not have submitted its combined discounted pricing or would have materially altered its bid and operational plan. WMATA's failure to disclose its superior knowledge deprived Diamond and other bidders of material information necessary to evaluate the

solicitation and price their proposals, and constitutes a breach of WMATA's contract-based duty to disclose superior knowledge.

### *WMATA Diverts RSHs to Challenger Despite Diamond's Exclusive Contract Award*

27. Notwithstanding WMATA's exclusive award to Diamond of 100% of all dedicated paratransit services across both zones, WMATA's Managing Director of the Department of Access Services, Mr. Christiaan Blake, decided from the very outset of the Contract to divert a certain number of RSHs from Diamond to a competitor, Challenger. Indeed, in Diamond's very first month of service as WMATA's "exclusive" paratransit vendor, Mr. Blake diverted *approximately 30,000 RSHs, or one-quarter of the total RSH volume in July 2024 to Challenger.* Mr.  Blake  – who is not the warranted Contracting Officer for the Contract – took these actions despite the fact that Challenger was an unsuccessful bidder not selected for *any* award.

28. WMATA's introduction of a competitor (Challenger) where none was supposed to exist has had substantial, deleterious effects on Diamond's wage and training costs and has imposed catastrophic disruptions to Diamond's efforts to manage its union relationships and its workforce, rendering Diamond's further performance under this Contract impracticable.

29. Attached hereto as **Exhibit 2** is an August 8, 2024 email from Jeremy Devray, Diamond's VP of Customer Success, to other members of the management team that relates a meeting he had earlier that day with Mr. Blake. In that meeting, Mr. Devray recounts Mr. Blake's explanations/justifications for awarding 30,000 RSHs to Challenger in July 2024, as well Mr. Blake's interpretation of the Contract:

- Mr. Blake believed that when WMATA awarded Diamond 100% of the service, it referred to 100% of the RFP pricing sheet scope that referenced 93,000 monthly service hours;

- The additional 30,000 of paratransit services required in July 2024 that Mr. Blake diverted to Challenger was a result of the slow deployment of the non-dedicated service, and that,

according to Mr. Blake, Challenger will compensate for the shortfall in the non-dedicated service, with the goal of phasing out Challenger as non-dedicated deployment increases;

• Mr. Blake referred to WMATA extending its prior contract with Challenger for a year, with no plans to extend it beyond the expiration date of June 30, 2025; and

• Mr. Blake told Diamond that if it demonstrates capacity and resources, WMATA is open to assigning Diamond more hours.

The positions described above in Exhibit 2 confirm that Mr. Blake either did not understand the basic terms of the Contract that WMATA awarded to Diamond, or that WMATA never had any intention of honoring WMATA's obligations to Diamond and WMATA's own procurement requirements.

30.  As an initial matter, the Contract itself makes abundantly clear that Diamond was the sole and exclusive awardee of 100% of the service volume for Zones 1 and 2. Challenger is not a selected vendor in either zone.

31.  WMATA acknowledged this fact in an October 29, 2024 letter from WMATA's Contracting Officer, James Knighton, in which Mr. Knighton wrote, "[i]n a multi-contractor environment, as WMATA operated before implementing Contract CACCS244151, it was possible to work around these challenges by emphasizing [Diamond's] strengths. However, when one contractor bears full responsibility for the entire service, such workarounds are no longer feasible. When WMATA awarded [Diamond] the 100% contract, it was with full confidence in [Diamond's] capabilities . . . ."

32.  There is no reasonable reading of the Contract that supports Mr. Blake's novel assertion that Diamond was awarded only 93,000 monthly service hours—or indeed any specific quantum of hours on either a monthly or an annual basis. *Rather, Diamond was awarded **all** of the dedicated service RSHs for at least a five-year period*. In accepting Diamond's bid for 100% of the RSHs over that period, WMATA confirmed that there would be no competition from Challenger or any

ME1\59767407.v1

other vendor of dedicated paratransit service. Indeed, selecting a capable vendor was precisely the purpose of the RFP and attendant competition, in which Diamond prevailed.  As such, Diamond was entitled to the economic benefits of exclusivity in exchange for providing WMATA the economic benefits of that lower, combined rate for both Zones 1 and 2.

33. Mr. Blake did not have, and currently does not have, any discretionary authority to sole source a collateral award to Challenger in derogation of Diamond's exclusive Contract and in violation of WMATA's own procurement rules and other regulations. Challenger was an unsuccessful bidder for this Contract. Mr. Blake has no authority to take public funds and channel them to "his" preferred vendor as a matter of his own discretion or whim. Yet that is *precisely* what he did, and what WMATA continues to do, in flagrant disregard of the law and Diamond's contractual prerogatives.

34. Mr. Blake's reference to a "one-year extension" of WMATA's prior contract with Challenger is particularly bizarre. Diamond is aware that Challenger offered a competitive bid for dedicated paratransit services in response to RFP 0000009715, and that Challenger's proposal was *not* selected for final award by WMATA. Diamond is not aware of any pre-existing contract between WMATA and Challenger to provide dedicated paratransit services that remains in effect following WMATA's 2024 solicitation and re-competition of dedicated paratransit service. After searching all of WMATA's contracts that are publicly available online at https://www.wmata.com/about/records/public-records.cfm, there are no such contracts awarded to Challenger Transportation, Inc. for dedicated paratransit services in either 2024 or 2025. If there is such a contract, that document should be available for public inspection and review. But as a practical and legal matter, even if WMATA *did* have a prior paratransit contract with Challenger, it would have expired of its terms when WMATA solicited the procurement of dedicated

10

paratransit services in RFP 0000009715 and awarded the instant, exclusive Conformed Contract to Diamond. WMATA has no authority to "extend" or otherwise resurrect an expired, void contract with Challenger that violates Diamond's exclusive award—even if such a contract with Challenger existed in the first place.

35. WMATA's assertion in its recent COFD that Challenger's contract was "extended" is contradicted by WMATA's own public statements acknowledging that Challenger's contract expired on June 30, 2024.

36. WMATA's diversion of RSHs and public funds to Challenger after June 30, 2024 therefore constituted an *ultra vires* sole-source procurement and an unlawful circumvention of the competitive procurement process.

37. For a brief period (September-December 2024), WMATA suspended the diversion of RSHs to Challenger and Diamond had an opportunity to operate its dedicated paratransit service exclusively.

38. Unfortunately, that period of exclusivity was short-lived. WMATA resumed its diversion of RSHs to Challenger in January 2025. Since April 2025, the number of RSHs diverted by WMATA away from Diamond to Challenger has grown steadily more pronounced. Based on the dispatching information available to Diamond, over the period from July 1, 2024 through October 31, 2025, WMATA has diverted ***327,476 RSHs*** from Diamond to Challenger. Although Diamond does not know the rate WMATA is paying Challenger for these RSHs, on information and belief WMATA has diverted ***more than $20 million*** worth of RSHs to Challenger over that period. These are public funds that WMATA has improperly diverted to Challenger without going through any proper, competitive procurement channel or approval. This conduct – which wastes millions of

taxpayer dollars – is a direct, material violation of both controlling law and Diamond's exclusive Contract award and prerogatives.

39. On August 15, 2025, Mr. Blake sent Diamond's management team an email (attached hereto as **Exhibit 3**) in which he indicated that WMATA planned to issue a new run cut that would reduce Diamond's Zone 1 RSHs even further, from the then-current level of 78,701 monthly service hours to 27,000 monthly service hours. This proposal, if implemented, would have caused Diamond to suffer massive and durable economic damages beyond those already caused by WMATA's prior diversions to Challenger.

### *WMATA's Responses to Diamond's Objections About the Diversion of RSHs to Challenger Are Entirely Improper and Intentionally Punitive.*

40. Diamond expressed to WMATA its concerns about these further RSH diversions to Challenger on September 9, 2025, and also the "pick process" that Mr. Blake alluded to in his email by which WMATA would select an unnamed, alternative operator (presumably Challenger) to service routes operated exclusively by Diamond's drivers. (Letter attached hereto as **Exhibit 4.**) Diamond explained in that letter that WMATA's expressed intention to reassign these routes and service hours did not consider potential liabilities of joint employment or interference with Diamond's workforce (which might trigger liabilities for both WMATA and Diamond under various labor and tax laws), or that this was tantamount to a sole-source diversion of Diamond's Contract outside of the competitive bidding process in violation of Diamond's exclusive Contract and WMATA's own procurement rules. Diamond offered to work collaboratively with WMATA to find an appropriate solution, either through a formal amendment and equitable adjustment process or through a new solicitation for other supplemental vendor proposals.

41. WMATA's response was plainly contrary to the terms of the Contract. On September 16, 2025, WMATA sent a letter reply to Diamond, which is attached hereto as **Exhibit 5.** In that letter,

12

WMATA claimed that it has unilateral authority to adjust RSH allocations away from Diamond and to assign them to another contractor, despite the "100% service" and exclusive terms of the Contract. In support of this position, WMATA cited page 134 of the Conformed Contract (Technical Specifications Part 2 of 2, "Scope of Work"), which provides:

> WMATA reserves the right to move or shift portions of service from one provider to another during periods of poor performance until said underperformance is cured. Likewise, WMATA reserves the right to solicit proposals at any time for additional Service Delivery contractors and to reassign work to these additional contractors.

But this language does not provide WMATA with unilateral authority to reassign any portion of Diamond's RSH volume to any alternative provider *because there is no alternative provider to which hours could be "shifted" or "moved."*

42.  In fact, this precise issue was brought to WMATA's attention during the Q&A process preceding Contract award (Pg. 180 of Conformed Contract):

> 8. Q: In the RFP WMATA states it has the right to move trips from one of the providers to a different provider at its discretion. Can WMATA clarify what the criteria is for trip allocation and where those other trips are going, for example are any trips moving to non-dedicated or overflow providers?
>
> A: *This language is related specifically to dedicated service. This contract is awarded by zone. Only one vendor will be awarded per zone. Therefore, there will not be movement of trips between vendors, except, possibly, DC-to-DC trips*.

(Emphasis added.)

43.  As reflected in the Contract, WMATA did not select two separate providers for Zone 1 and for Zone 2 as between which corrective allocations might be assigned. Rather, WMATA chose instead to award 100% of the RSH volume solely and exclusively to Diamond. There is no "other provider" to which WMATA might redeploy portions of service, even if WMATA had any legitimate concerns about Diamond's performance.

13

44. While WMATA has a right to pursue a new solicitation for paratransit service, it has not done so and it may not award a sole-source, collateral, multi-million dollar contract by fiat. This point was explained to WMATA directly in Diamond's September 26, 2025 letter, which is attached hereto as **Exhibit 6**.

45. Rather than work constructively with Diamond and honor its contractual obligations, on October 31, 2025, WMATA sent a letter and attached an Excel spreadsheet that described a new "run cut" (the set of dedicated paratransit driver route assignments), which effectively halved Diamond's RSHs and split service between Diamond and Challenger on a nearly 50/50 basis. It is apparent that WMATA took this punitive action as a reprisal against Diamond in response to Diamond's assertions of its contractual rights. WMATA's October 31, 2025 letter is attached hereto as **Exhibit 7.**

46. In this October 31 letter, WMATA reiterated the same baseless textual justification for the reduction of Diamond's RSHs (page 134 of the Confirmed Contract) without acknowledging or addressing Diamond's prior refutation of the plain inapplicability of that language as a result of the exclusive, 100% service award to Diamond. WMATA's claimed justification for the new run cut (which WMATA directed must be implemented on a rushed basis within 30 days) is nonsensical, patently wrong, and is further evidence of WMATA's ongoing material breaches and its constructive termination for convenience of its contract with Diamond.

47. WMATA's October 31 letter also suggested that Section 18 of WMATA's Standard Terms and Conditions (the Changes Clause) provides adequate authority for WMATA's new run cut directive and the reallocation of half of the paratransit service hours to Challenger. Once again, WMATA is wrong. The Changes Clause only applies to modifications of the terms of performance *that are within the scope of the Contract*. WMATA's illegal, sole source diversion of half of

ME1\59767407.v1

Diamond's RSHs to Challenger, outside the context of any documented procurement process, is plainly a cardinal change that is far beyond the scope of the changes clause. *See, e.g., Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1276 (Fed. Cir. 1999) (the law recognizes that the imposition of a "drastic modification" to a contract by an agency is "considered a cardinal change that constitutes a material breach."). The Changes Clause is not an infinitely elastic loophole through which WMATA might backdoor a collateral procurement.

48. WMATA's hasty and ill-considered instruction to rapidly implement this run cut within 30 days created an emergency where none existed and threatened to fundamentally disrupt Diamond's relationships with its union workforce. Notably, on November 4, 2025, Diamond's CEO, Erick Van Wagenen, sent WMATA an email (attached hereto as **Exhibit 8**), in which he explicitly advised that this latest run cut would cause massive destabilization among Diamond's union workforce that would further frustrate and interfere with Diamond's performance.

49. Specifically, Diamond advised WMATA "this run-cut will necessitate a significant reduction in headcount, requiring Diamond Transportation to issue the appropriate WARN Notices to employees, union members, union leadership, local officials, and federal and state authorities. It also does not allow us to provide 60 days' notice to our employees." As a result of the WARN notices/layoffs and the immediate need to engage in effects bargaining with its unions, Mr. Van Wagenen reiterated Diamond's written notice to WMATA pursuant to Section 8 of the Standard Terms and Conditions of the Contract that WMATA's precipitous actions in this regard were likely to introduce labor disputes that threatened Diamond's ability to perform.

50. On November 7, 2025, WMATA directed Diamond to implement the new run cut—despite Mr. Van Wagenen's warnings that such hasty and ill-considered actions would cause substantial turmoil and disruption among the union workforce.

15

51. WMATA's direct and intentional interference with Diamond's union workforce did not stop merely with the issuance of this punishing run cut. Several posted union alerts at Diamond's facilities confirm that WMATA has been separately coordinating with Challenger and Diamond's union workers to affirmatively divert Diamond's workforce to Challenger. Two examples of these posted union alerts are attached hereto as **Exhibit 9**. Among other things, these notices confirm WMATA's close coordination and "agreements" with Challenger and the union to effectuate transfers of Diamond's workers to Challenger and directing/interfering with Diamond's workforce:

- "WMATA IS PREPARING A NEW RUN CUT & SHIFTING WORK BETWEEN [DIAMOND] & CHALLENGER!"

- "All ATU Local 689 MetroAccess paratransit drivers at any of our locations will have the opportunity to pick, based on seniority, a run that is attached to a company location (i.e., either with Challenger's new garage or any of [Diamond's] garages)."

- "**WMATA**, Challenger, and Local 689 have agreed that the pick should take place within the next 2 to 3 weeks. Once you select that run you will work at that location for that company!" (Emphasis added)

- ". . . **WMATA prepared a new "Run Cut" in order to take work from [Diamond] and give it to Challenger Transportation**. . . . The Union, WMATA, and Challenger planned to facilitate a "Master Pick," that was scheduled to start later this week. This would have allowed you to simply pick a new run at any location and you would be easily and seamlessly transferred to that new location and company." (Emphasis added)

52. Diamond refused to go along with WMATA and Challenger's plans. Diamond advised its unions that it will not facilitate WMATA's wholly improper efforts to interfere with Diamond's workforce and redirect drivers to Challenger. These union notices evidence the "outrage" Diamond's drivers now misdirect against Diamond, demonstrate the degree to which WMATA has poisoned Diamond's relationships with its unions, and show why further performance over time is now impracticable as a result of WMATA's blatant, intentional misconduct and material breaches.

53. WMATA's scheme to choreograph the diversion of Diamond's workforce reached a crescendo on November 18, when Mr. Blake made an unannounced and unsolicited visit to Diamond's Hubbard Road operational headquarters. Mr. Blake was observed speaking directly to drivers and encouraging them to visit Challenger's new garage, learn about Challenger's operation, review Challenger's shift bids based on the new run cut allocations, and then decide whether to decamp Diamond for Challenger. The brazenness of Mr. Blake's direct and intentional interference with Diamond's employees in Diamond's own facility is nothing short of outrageous. Mr. Blake's conduct further confirms his clearly improper relationship with – or at least unexplained advocacy for – Challenger.

54. WMATA plainly violated its duty of good faith throughout the parties' course of dealing and thus materially breached the Contract. Indeed, there are numerous examples of WMATA's intentional frustration of Diamond's ability to perform and expressed desire to deny Diamond the key benefit to which it was entitled under the 100% service award, namely, the benefits of exclusivity and the economies of scale that were the essential predicate of the lower, combined bid that WMATA both accepted and has continued to enjoy.

55. Throughout the parties' course of dealing, WMATA has consistently demanded all of the benefits of its bargain, but has consistently denied Diamond its basic, bargained-for expectations. By diverting RSH's to Challenger and denying Diamond is fruits of its contract, WMATA effected a cardinal change and a material breach, which it has recently only exacerbated through the most recent run cut and affirmative coordination and interference with Diamond's employee unions and with Diamond's competitor, Challenger, to disrupt Diamond's workforce and frustrate Diamond's ability to perform.

ME1\59767407.v1

56.  When Diamond asserted its prerogatives under the Contract and demanded fair treatment (either a return of the exclusivity at the heart of the award, or an equitable rate adjustment to compensate Diamond for the denial of its promised exclusivity), WMATA turned to punitive measures and interference with Diamond's workforce that were calibrated to inflict pain and command compliance despite WMATA's own cardinal changes and material breaches. This is the soul of bad faith.

57. On November 26, 2025, Diamond served upon WMATA its Certified Claim for retrospective damages and costs associated with the orderly wind-down of its operations pursuant to an imputed termination for convenience as a result of WMATA's numerous material breaches of the Contract and the duty of good faith and fair dealing.

58.  After Diamond served its Certified Claim upon WMATA, several members of Diamond's management provided short notice that they would leave the company with immediate or nearly immediate effect.  This includes Diamond's Safety and Training Manager, Crystal Hall, who announced on December 10, 2025 that she would be leaving effective December 17, 2025 and taking a position with WMATA to work directly for the COTR on this Contract, Terrian D Williams-Hall.

59.  On information and belief, Challenger continues to recruit Diamond drivers and personnel by telling them that Challenger will assume all of the dedicated paratransit service for WMATA, making employee retention even more difficult given the friction and uncertainty that WMATA itself has introduced.

## IV.    CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT

60.  Diamond re-alleges and incorporates ¶¶ 1-59, inclusive, as if set forth fully herein.

61. WMATA Conformed Contract #CACCS244151 was awarded by WMATA to Diamond on June 21, 2024, to provide 100% of dedicated MetroAccess paratransit service delivery throughout WMATA's service geography over a five (5)-Year Base Period from July 1, 2024, through June 30, 2029.

62. WMATA represented in the solicitation and award that Diamond would be the exclusive provider of dedicated paratransit services in Zones 1 and 2. WMATA was contractually obligated to dispatch and allocate "run cuts" consistent with those representations for the Contract term, including from at least July 1, 2024 through June 30, 2029.

63. WMATA materially breached the Contract when it improperly diverted RSHs for dedicated paratransit services away from Diamond to Challenger, a competitor that was an unsuccessful bidder for the Contract and that did not receive an award.

64. WMATA's improper diversion of RSHs away from Diamond to Challenger began from the very first month of contract performance (July 2024) and continues through the present.

65. WMATA has materially breached the Contract by depriving Diamond of the economic benefits of exclusivity upon which its pricing model and bid were predicated and the economic expectations of exclusivity that were the basis of Diamond's award.

66. WMATA has materially breached the Contract by diverting more than 350,000 RSHs to Challenger between the period July 1, 2024 - December 31, 2025 (which diversion continues) and depriving Diamond of associated revenues that were awarded exclusively to Diamond.

67. WMATA has materially breached the Contract by inducing Diamond into committing to a lowered price for RSHs for its dedicated paratransit service, which pricing was premised upon the economies of scale and expectations of exclusivity, despite WMATA never intending to honor its contractual obligations or the terms of the exclusive award.

ME1\59767407.v1

68. WMATA has materially breached the Contract by affirmatively and intentionally interfering with and colluding with Diamond's employee unions and with Challenger to introduce labor disputes and disruptions to unjustly prevent Diamond from performing paratransit services per the terms of the Contract.

69. As a direct and proximate result of these material breaches of the Contract, Diamond has suffered substantial economic damages, which damages continue to accrue.

70. Under the common law rule of discharge, one party's material breach of a contract will excuse the other party's continued performance.

71. In the context of a government contract, a contractor must continue to perform pending an adjudication of a contract dispute. Thus, Diamond continues to perform at sufferance, and continues to accrue damages, pending a judicial disposition that allows Diamond to cease further performance and collect all permitted costs associated with the orderly wind-down of its operations pursuant to an imputed or adjudicated termination for convenience.

## COUNT II – BREACH OF THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

72. Diamond re-alleges and incorporates ¶¶ 1-71, inclusive, as if set forth fully herein.

73. All contracts contain an implied duty of good faith and fair dealing, which means that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Murray v. Wells Fargo Home Mortg.*, 953 A.2d 308, 321 (D.C. 2008) (quoting *Allworth v. Howard Univ.*, 890 A.2d 194, 201 (D.C. 2006)).

74. Conduct that is arbitrary and capricious, evading the spirit of the contract, willfully rendering imperfect performance, or interfering with performance by the other party, all constitute forms of breach of the implied covenant of good faith and fair dealing in any contract. Liability

ME1\59767407.v1

lies for breach of the duty of good faith and fair dealing if a party (1) evades the spirit of the contract, (2) willfully renders imperfect performance, or (3) interferes with performance by the other party.

75.  The duty of good faith and fair dealing required WMATA not only to avoid actions that unreasonably cause delay or hindrance to Diamond's contract performance, but also to do whatever is necessary to enable Diamond to perform per the terms of the Contract.

76.  As set forth herein, WMATA has consistently sought to subvert the fundamental bargain at the heart of the Contract and has acted in a manner designed to frustrate or prevent Diamond's performance under the Contract.  This includes, without limitation: (1) WMATA's interference with Diamond's workforce and unions to introduce labor disputes and disruptions; (2) WMATA's increasingly draconian and punitive "run cuts" that improperly divert proportionally larger shares of dedicated paratransit service to an unawarded competitor, Challenger; (3) WMATA's refusal to engage in an equitable adjustment process to compensate Diamond for the loss of exclusivity and economies of scale that were the underlying predicates for its pricing model that WMATA accepted and awarded in the first instance; and (4) WMATA's intention from the outset of the Contract's period of performance to deny Diamond the fruits of  its bargain and an exclusive award.

77.  It is now clear that WMATA never had any intention of honoring the exclusive nature of the contract awarded to Diamond.  In its COFD, WMATA asserts that it was obliged to extend Challenger's old (pre-RFP) contract because of WMATA's purported legal obligations under the ADA, notwithstanding that Challenger's contract necessarily ended when WMATA elected to recompete dedicated paratransit services and selected Diamond for an exclusive award—exclusivity that *WMATA* made a key condition in its own RFP.

78. WMATA's COFD wrongfully and unlawfully purports to "extend" indefinitely Challenger's pre-RFP paratransit contract despite issuing Solicitation ID #0000009715 and awarding Contract ID #CACCS244151 exclusively to Diamond. WMATA's conduct and claimed authority to sustain or resurrect the pre-existing contract with Challenger, which necessarily expired upon the award to Diamond, violates basic standards of procurement law as well as the plain terms of the Contract.

79. Indeed, WMATA induced Diamond (and others, including Challenger) to submit pricing bids that were premised on the benefits and economies of scale conferred by exclusivity, while failing to disclose that it had no intention of honoring that exclusivity. Of course, WMATA has consistently enjoyed the benefits of Diamond's lower-price bid for exclusive paratransit services in both Zones 1 and 2 and has continued to extract all of the economic benefits of that pricing while denying Diamond the benefits of its side of the bargain. This is the soul of bad faith. WMATA's bad faith has infected the Contract and its underlying premise from the outset; WMATA's material representations and nondisclosures caused Diamond to submit artificially low pricing commitments based upon a false expectation of exclusivity are additional grounds for termination and relief.

80. Furthermore, it is apparent that WMATA has imposed ever more punitive and intrusive measures to deny Diamond the benefits of the Contract and to affirmatively and unjustly prevent Diamond's performance after Diamond began to raise concerns and assert its prerogatives under the Contract. Beyond the implied covenant of good faith and fair dealing that applies to any contract, including this one, WMATA's designedly oppressive and retributive misconduct is further evidence of bad faith, which provides additional grounds for relief.

81. As a direct and proximate result of WMATA's violations of the implied covenant of good faith and fair dealing, and WMATA's demonstrated bad faith misconduct, Diamond has suffered substantial economic damages that continue to accrue.

82. As a direct and proximate result of WMATA's misconduct and interference with Diamond's workforce, further dealings with WMATA and continued performance under the Contract has become both untenable and impracticable and WMATA has effected a *de facto* termination for convenience of the Contract that both excuses Diamond's further performance and provides grounds for Diamond's full measure of contract damages.

## COUNT III – DECLARATORY JUDGMENT

83. Diamond re-alleges and incorporates ¶¶ 1-82, inclusive, as if set forth fully herein.

84. Under the common law rule of discharge, WMATA's material breach of the Contract excuses Diamond's continued performance.

85. In the context of a government contract, a contractor like Diamond must continue to perform pending an adjudication of a contract dispute that permits suspension or cessation of further performance.

86. There is currently an actual and immediate controversy regarding Diamond's continuing obligations to perform under the Contract and continue to accrue damages, despite WMATA's numerous, material breaches of the Contract.

87. As a result of WMATA's continued improper diversion of RSHs to Challenger, WMATA has forced Diamond into a durable "loss position" on this Contract, whereby Diamond will continue to lose a substantial amount of money each month it is forced to continue performance.

88. While the ultimate quantum of Diamond's damages and compensable termination for convenience costs may be determined by the Court after a more complete evidentiary hearing

process, Diamond seeks expedited declaratory judgment relief in the form of a judicial declaration that: (1) WMATA is in material breach of the exclusive, 100% award of dedicated paratransit services to Diamond under WMATA Conformed Contract #CACCS244151; (2) WMATA's material breaches of that Contract excuse Diamond's further performance under that Contract; (3) within 90 days of the Court's entry of the declaratory judgment, Diamond will wind-down and cease all further performance under the Contract and WMATA will find one or more substitute providers of dedicated paratransit services to meet its obligations under the ADA and to the disabled community in the region that relies upon these transportation services; and/or (4) such other equitable relief the Court deems appropriate.

## V.    PRAYER FOR RELIEF

WHEREFORE, Diamond respectfully requests that this Court enter judgment against WMATA as follows:

(a)    Declare that WMATA has materially breached WMATA Conformed Contract #CACCS244151;

(b)    Declare that WMATA's diversion of work and payments to Challenger after June 30, 2024 were *ultra vires* and unlawful;

(c)    Declare that WMATA's material breaches and misconduct give rise to a *de facto* termination for convenience of the Contract;

(d)    Declare that WMATA's material breaches excuse Diamond's further performance of the Contract under the common law rule of discharge;

(e)    Enter and issue an implementing injunction effectuating the foregoing declarations of rights, and direct that  within 90 days of the Court's entry of the declaratory judgment, Diamond will wind-down and cease all further performance under the Contract and WMATA will find one

or more substitute providers of dedicated paratransit services to meet its obligations under the ADA and to the disabled community in the region that relies upon these transportation services;

(f)    Award Diamond all contract damages to which it demonstrates entitlement, including, but not limited to, all accrued retrospective contract damages, the properly reimbursable costs associated with the orderly wind-down of Diamond's operations pursuant to Section 27 of WMATA's Standard Terms and Conditions ("Termination for Convenience," incorporated by reference into the Contract), plus any pre-judgment interest and costs, attorney fees, and all other legal and proper relief to which Diamond may be entitled.

## VI.    JURY DEMAND

Diamond respectfully demands a jury trial in the aforementioned matter for all issues so triable.

Respectfully submitted,

/s/Matthew M. Wright
Matthew M. Wright, Esq. (DCB# 474731)
Franklin C. Turner, Esq. (DCB# 989052)
Alexander W. Major, Esq. (DCB# 494872)
McCarter & English LLP
1301 K Street, Suite 1000 West
Washington, D.C. 20005
Tel. (202) 753-3400
Fax. (202) 354-4604
MWright@McCarter.com
FTurner@McCarter.com
AMajor@McCarter.com

*Attorneys for Plaintiff, Diamond*
*Transportation Services, Inc.*

January 28, 2026